Judges of the United States Court of Appeals for the 2nd Circuit. Hear ye, hear ye, hear ye. All persons having business before this, a stated term in the United States Court of Appeals for the 2nd Circuit, draw near, give your attention, and ye shall be heard. Good morning everyone, please be seated. So before we start, I understand that there are some students from the NYCI school. Is that right? Raise your hands, those of you. Well, welcome to the 2nd Circuit Court of Appeals. This is a public forum, and I hope you all learned something today, this morning's oral argument. I understand that all counsel for today's argument cases, as well as Mr. Inouye are here, so we'll dispense with the calling of the calendar. We'll therefore start right away with the first matter on today's calendar, Richford Health Center v. United States of America, 23-344. Good morning, Your Honor. May it please the Court. Matthew Freitas, along with Rosie Dawn Griffin for appellants, Richford Health Center, also known as Northern Tier Community Health, which I'll refer to as NOTCH, and Dr. Teague Marco. Your Honor, this case is quite a bit more simple than was made by the District Court below. It's about an absolute immunity that the Public Health Service Act affords to public health service employees, and was extended to what's known as deemed public health service employees, which is what NOTCH is, and its employees and personnel are. They have the same absolute immunity that actual public health service employees have. That's a command in the statute that extended the immunity to. Do you mean to say that because somebody works partly for the government, they have immunity in anything they do, even if what they did had nothing to do with their government employment? No, Your Honor. The test for the immunity that they have is quite straightforward, and it is broad with respect to the functions that it speaks to, but it speaks to specific functions. So it's not everything. It's not what you're driving to. But why was anything that this doctor did anything to do with his government employment? Well, he wasn't actually a government employee. I mean, he was an employee of NOTCH, which was, yeah. Correct. Correct, Your Honor. And that's because NOTCH puts in a grant application to the United States government and identifies the activities that it intends to perform as it's deemed federal employment. And the phrase that's used in describing a health center's employment is scope of project, because it's an entity. It's not a person. So it has a project that it fulfills with its grant dollars and other monies. And then, of course, because it's an entity, it can't perform medical services. It has to do that through its employees. One of those employees is Dr. Marco, and when NOTCH asked for permission to get that grant that made it eligible to be a federal employee or deemed a federal employee, it specifically told the government, we would like to put one of our physicians into area nursing homes and rehabilitation facilities to perform the role of medical director and attending physician. So in that role, basically it's NOTCH, the entity, is performing that role. But they do it through their employee, Dr. Marco. So they asked the government through an application known as a grant application, can we do this? Can we put Dr. Marco or a person? But that's reading an awful lot into this grant application, isn't it? I don't think so, Your Honor. That's the nature of these grant applications. They spell out the activities, the medical and related functions, which if I could get back to the test that I was alluding to, the test for immunity involves whether the function performed, it's really conduct-driven, whether the function performed was medical, surgical, dental, or related. And then that function has to be performed within the scope of employment of the entity or the individual. But the regulation also says that the services have got to fit squarely in the set of examples that are set out. It does say that, Your Honor. The regulation, however, is- It would be a problem. It would be a problem if the regulation had binding effect. The agency which authored the regulation, I can give a site when I come back for rebuttal, there's a site where the agency itself says that regulation does not impose binding requirements. It's interpretive. And that's why we can apply it retrospectively. So it's basically illustrative and advisory. And it says here are things that we think you will do and you may do. But what this court said in the agent v. Rasmusson decision is that you can't- the agency or the federal government cannot take a regulation, this particular regulation, I believe the one you're referring to, Your Honor, or a manual or a policy or anything and narrow a statutory element to an immunity test. And that's what the government did in agent. And this court struck that down saying, no, you cannot take your regulation or your policy and narrow a statutory element of an immunity test. And that's essentially what they did. And that's what they're doing here again. And they got the district court to buy off on this, is they took the regulation and they used it to narrow down the circumstances that would otherwise easily satisfy the test that I alluded to. And I would stress, too, that the government, when it first came into this case- who is not doing that, even though they do things, they are yours, but they're doing something else. And if that is the background, shouldn't these regulations, agency, and so on, be read in what is the normal way of doing things? You're asking us to read it in a particular way, which would be very, very odd in terms of what we do as a general background. I respectfully disagree, Your Honor. Essentially, the government and every other litigant in this case recognizes that Dr. Marco could see the majority of patients in these nursing homes and that that would be covered. The district court below and the government below recognized that everything in this case could be covered if- and this is their position, not ours- if the applicant had asked for permission to see people that didn't have a pre-existing relationship but not, which is only a sliver of the patients at the nursing homes. The vast majority would have a pre-existing relationship. A sliver would not. The government concedes- But that, again, is in perfect keeping with the background. That is, if somebody is in a position to make, to borrow a servant, then that servant is borrowed. And that's what that- what you say are the bulk of the patients. I don't know if they're not, are or not. But that, again, is perfectly traditional. But when somebody is not borrowed for that purpose, traditionally that's not. I may not be following the train of thought, Your Honor, but I want to refer you to what I think speaks to that question. I hope it- hopefully it does. And this is from a declaration from the Department of Health and Human Services, which administers this program, the health center program and the deeming program, the program that confers immunity. This is the representative of the secretary saying, Notch's grant application contemplated the placement of a Notch-employed physician to provide medical care and or services to non-federally funded, skilled nursing homes in Notch's target communities. That is the- that's an attorney for the Department of Health and Human Services that wrote a declaration in this case eight or so months into litigation while the government still advanced the position that I'm advancing here today in this very case. That is the Department of Health and Human Services saying your project, in other words, your employment health center, contemplates exactly what I just said. That means sending. I don't know if that makes it a borrowed servant or not. I'm sorry, Your Honor. That's- my tort law is a little rusty. So- but I would say what it contemplates is exactly what that servant is supposed to do on behalf of the health center. And they were supposed to go in there and do this. The government would have no problem if Mr. Kelly had one prior interaction with a Notch physician or anyone. One prior. He had a tooth removed. He came in and had a, you know, something carved off his skin. He had any kind of procedure. Fine. That's covered. Just because he didn't have a preexisting connection, the government says not covered. And I would just say that defies common sense in terms of what establishes a patient relationship. The other point I'd like to make- I think I'm over. If I- so- You can make your point and then we'll hear from the other side. Yes, Your Honor. I just wanted to say that when the government puts a physician into a location and that physician exercises independent judgment and controls the services at that place, not the rest of it, not what the nurses do, not what the administrators do, just that medical function. That's what Dr. Marker did. Then that function is controlled by the health center. That's the basis on which the patient relationship is formed. Thank you. Thank you. We'll hear from the government. You can lower that podium. Thank you. I'm quite a bit shorter. May it please the Court. I'm Dana Karasvong for the United States. This activity is not covered, and you can see that right in the statute. The statute distinguishes between care for patients and care for non-patients. And in the non-patient provision, it's 230- So it's patient-focused, not doctor-focused. It's patient-focused, Your Honor. Yes. So the statute says, and this is a predicate to everything that we were just talking about, to get to the coverage, the statute says, the deeming does not apply unless the secretary determines in advance, after reviewing an application, that the treatment of non-patients is going to satisfy the statutory criteria. The application here didn't do that. The statute, this is in D, has some requirements for what you have to tell the secretary. You have to provide detailed information, supporting documents, about how it's going to satisfy the non-patient provision. They didn't do that. They don't say anything in the grant application about treating non-patients at all. They talk about continuity of care, to continue caring for our patients once they've been admitted to a nursing facility. You can see that all on J's 279. So this is all about, this is a threshold requirement for coverage to apply, and it just wasn't satisfied here. So the secretary has said, right, there are two ways you can satisfy that requirement. One is by fitting within the examples in the regulation, and the other is by asking in advance. They didn't do either of those things. The district court's decision that this isn't within the scope of the regulation is supported by the evidence at hearing, and I don't see anybody challenging that. In terms of, I'm happy to answer any questions. But if there aren't any, I'll reserve the remainder of my time. Okay, thank you very much. Sorry, I'll ask the clerk to affirm. Yes, we got you. Let me start with the provision that I think the government council was referring to, and that's Section 233G. That provision was added in 1995. In 1992, when the immunity was first extended to deemed individuals and entities, the language they're relying on to restrict it didn't exist. So their position couldn't hold up from 1992 to 1995. In 1995, the statute was amended to add this provision, and it did it. And the history shows this, but the wording of it shows it as well. It did it for a procedural reason. And ironically, it was done for the benefit of the health centers, not to narrow or restrict their immunity. The case that I would direct the court's attention to, that I think does the best job so far in dealing with this provision, is Friedenberg versus Lane. It's G. What subsection? 233G1D. Well, that's the deeming provision. And then the provision that they're looking at is 233G1B, and that should have two subsections that refer to patients and non-patients. That procedural provision was added because physicians like Dr. Marco, when they went out into the community, outside the four walls of the health center's clinics, were not sure they were going to get covered. Like, wait a second. Are we going to get this immunity when we're not at the health center doing other activities? So this provision was a way for the health center to give its physicians assurance that they'd be protected so that they would come and work for health centers and make – Do you agree that the reference point – so I appreciate what you're saying. The reference point is the patient. No, Your Honor. The reference point in 233A, the immunity provision, doesn't say one word about the patient. It talks about conduct. And so I would say that the immunity statute is conduct-driven. That's what the Friedenberg versus Lane County case will explain to. 233G is a procedural application provision. If you were to take 233G and do what the government is suggesting here, it would narrow the immunity in 233A to just providers' activities. But we know it's not because the immunity extends to officers, directors, employees, non-providers for related functions. So if you – and the Lane County case was an example of where it's not care to just patients where the protection is afforded. Lane County involved non-patient claimants who had never stepped foot into the health center, bringing claims against the health center for which there was immunity. So I think I'm over again, and I don't want to indulge anymore. Thank you. We'd ask that you reverse. Thank you. I think we got that. Thank you very much. We'll reserve the decision.